**PLASMA CTR. OF AMERICA v. TALECRIS PLASMA RESOURCES**

[222 N.C. App. 83 (2012)]

PLASMA CENTERS OF AMERICA, LLC Plaintiff, v. TALECRIS PLASMA
RESOURCES, INC. Defendant

No. COA11-1266

(Filed 7 August 2012)

**1. Contracts—breach—motion for JNOV—modification not
barred by statute of frauds—other arguments not preserved**

The trial court did not err in a breach of contract case by
denying defendant's motion for JNOV on the issues of whether
the parties modified the completion dates contained in Schedule
4 and whether defendant waived its right to enforce plaintiff's
failure to meet those deadlines. Because the arguments as to
mutual assent and willing and able to perform the agreement
were not properly raised at the time of the motion for directed
verdict, they were not considered. Further, the trial court cor-
rectly determined that the modification alleged by plaintiff was
not barred by the statute of frauds under N.C.G.S. § 22-2.

**2. Damages and Remedies—motion for new trial—reasonable
certainty**

The trial court did not err by denying defendant's motion for
a new trial as to damages because it was reasonably certain that
the plasma center would have been open and producing plasma
in time to comply with the deadlines as amended during the sta-
tus update meetings.

Appeal by defendant from judgment entered 30 December 2010
and order entered 2 March 2011 by Judge Paul C. Ridgeway in Wake
County Superior Court. Heard in the Court of Appeals 25 April 2012.

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P.,
by Michael W. Mitchell and Clifton L. Brinson, for plaintiff-
appellee.*

*Kilpatrick Townsend & Stockton LLP, by Adam H. Charnes and
Richard D. Dietz, and Graebe Hanna & Welborn, PLLC, by
Christopher T. Graebe and Mark R. Sigmon for defendant-
appellant.*

STEELMAN, Judge.

Arguments not raised by defendant in its motion for a directed verdict will not be considered by this Court when reviewing the denial of the motion for judgment notwithstanding the verdict. The trial court correctly concluded that the contract did not fall under the statute of frauds. Plaintiff's damages were proven with reasonable certainty, and defendant's motion for a new trial was properly denied.

## I.  Factual and Procedural Background

This appeal arises out of a contract dispute between Plasma Centers of America, LLC ("PCA") and Talecris Plasma Resources, Inc. ("Talecris"). Talecris Biotherapeutics, Inc. ("TBI"), the parent company of Talecris, is a biotechnology company that sells medical therapies. These therapies require human plasma, which is collected from donors at plasma centers. Medical professionals, including physicians, staff these centers. In October 2006, TBI contracted with Bio-Medics, Inc. ("Bio-Medics"), the parent company of PCA. Under this agreement (the "2006 Agreement"), Bio-Medics agreed to supply plasma to TBI and to provide TBI with the right to purchase plasma centers that were to be constructed by Bio-Medics.

Several months after entering into the 2006 Agreement, the parties began negotiating a more detailed and expansive contract. During this time, TBI formed Talecris and Bio-medics formed PCA. Talecris and PCA negotiated a new contract (the "2007 Agreement"), which differed from the 2006 Agreement in several respects. First, PCA was required to supply specific annual amounts of plasma. Second, PCA was required to open three plasma centers in 2007 and five in 2008 by deadlines contained in Schedule 4 of the agreement. Third, a "Conditional Purchase Obligation" required Talecris to purchase plasma centers that met certain specifications within eighteen months of the center's opening date. Finally, there was a "Termination for Cause" provision. The termination provision allowed Talecris to terminate the contract if PCA failed to meet any of the individual supply requirements or opening deadlines.

Pursuant to the 2007 Agreement, the representatives of the parties held weekly meetings, typically by telephone. Before those meetings, each party submitted PowerPoint slides that Talecris assembled for use at the meeting. The first PowerPoint slide submitted by PCA indicated that PCA would miss its first deadline—opening the San Bernardino, California center by 31 October 2007. Instead, the slide had an opening date of 12 November 2007. The language "To be reviewed and agreed upon today" was contained on the slide.

In early October 2007, PCA began submitting slides stating that it would miss the opening deadline for another center. The "[t]o be reviewed and agreed upon today" language did not appear on these or future slides. PCA continued to submit slides at each of the 45 weekly meetings indicating that it would miss upcoming deadlines.

By the end of 2007, PCA had failed to meet the three 2007 opening deadlines listed in Schedule 4. In February 2008, Talecris hired a construction management company, Equis, to oversee the progress of the construction of four of the centers. In April 2008, Talecris loaned PCA $2.3 million. After nearly six months of negotiations, the parties executed a new agreement on 6 June 2008 (the "2008 Agreement"). The 2008 Agreement was a "blackline" document. It contained a copy of the 2007 Agreement, striking through certain contractual provisions and underlining new or changed ones. The completion deadlines were extended for the centers that were originally due to be completed in 2008. But the deadlines for centers that were due to be completed in 2007 were not changed, even though these deadlines had already passed.

Less than a month after the parties executed the 2008 Agreement, PCA missed the 30 June 2008 deadline listed in Schedule 4 to open a center in Stockton, California. The parties continued to hold weekly status update meetings. The slides presented at these meetings projected start dates beyond those contained on Schedule 4. On 12 August 2008, Talecris's parent company announced that it had agreed to be acquired by a foreign competitor, CSL Ltd. As part of the acquisition, Talecris entered into a plasma supply agreement with ZLB Plasma, a subsidiary of CSL.

The day after the merger, Jim Moose, a Talecris Senior Vice President, contacted PCA Presdent Gary Crandall and stated, "[E]verything's going to be the same. We are still going to be working with you." The parties held a status update meeting on 21 August 2008. An internal analysis by Talecris showed that the agreement with ZLB Plasma would provide plasma that would exceed its manufacturing capacity. The analysis showed that Talecris could avoid the expense of acquiring the centers from PCA. On 25 August 2008, Moose contacted Crandall and informed him Talecris was terminating the contract, stating, "[W]e don't need you guys anymore. We don't need the plasma and we are terminating the contract."

Based on the missed Stockton center deadline, Talecris sent a notice of default and thirty-day right to cure on 26 August 2008. PCA

failed to cure the default. PCA sued Talecris for breach of contract based on two theories: (1) Talecris waived its right to terminate based on the Stockton center opening date and (2) the parties agreed to modify the Schedule 4 deadlines at the weekly status meetings to conform to the slides. Before the case was submitted to the jury, Talecris moved for directed verdict. That motion was denied. The jury ruled for PCA on both theories, specifically finding that the parties modified their agreements, both orally and in writing, and that Talecris waived rights and remedies under the agreement. The jury awarded PCA $37 million in damages. The trial court denied Talecris's motions for Judgment Notwithstanding the Verdict (Rule 50(b)) ("JNOV") and for a new trial (Rule 59).

Talecris appeals.

## II.  Judgment Notwithstanding the Verdict

[1] In its first argument, Talecris contends that the trial court erred in denying its motion for JNOV on the issues of (1) whether the parties modified the completion dates contained in Schedule 4 and (2) whether Talecris waived its right to enforce PCA's failure to meet those deadlines. We disagree.

### A.  Standard of Review

The standard of review for the denial of a motion for JNOV requires us to

> determine whether, upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of the non-movant, the evidence is sufficient to be submitted to the jury. A motion for either a directed verdict or JNOV should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim.

*Shelton v. Steelcase, Inc.*, 197 N.C. App. 404, 410, 677 S.E.2d 485, 491 (2009) (citations omitted) (internal quotation marks omitted). We review questions of law *de novo. Powell v. City of Newton*, 200 N.C. App. 342, 344, 684 S.E.2d 55, 58 (2009).

### B.  Analysis

PCA litigated this case based on several theories. One theory was that at each weekly status update meeting, the parties orally agreed to modify Schedule 4 of the 2008 agreement. More specifically, each

time representatives of the parties met telephonically, they agreed to change the completion deadlines to those contained on the slides that they reviewed. Under this theory, the completion deadlines contained on the slides that were presented at the last status update meeting would control. Talecris counters that its representatives did not agree to modify the completion deadlines and that mutual assent, an essential element of a contract, was missing. *See Creech v. Melnik*, 347 N.C. 520, 527, 495 S.E.2d 907, 912 (1998) (discussing elements of a contract). Talecris also contends that, even if there was mutual assent to modify Schedule 4, oral modifications were barred by the statute of frauds. *See infra* Section II.B.2 (discussing the statute of frauds). Talecris further argues that PCA cannot recover because it was not willing and able to perform under the 2008 Agreement.

PCA contends that Talecris has not preserved its mutual assent and "willing and able" arguments for appellate review. Therefore, PCA argues, if the contract is not governed by the statute of frauds, this Court must assume that there was sufficient evidence of mutual assent and that PCA was willing and able to perform its contract obligations to submit those issues to the jury.

### 1.  Preservation Issues

Talecris argues that the trial court erred in denying its motion for JNOV because (1) there was no evidence of mutual assent to the alleged modifications of the completion dates and (2) there was no evidence that PCA was "willing and able" to perform its obligations under the contract. We do not address the substance of these arguments because Talecris did not preserve these issues for appellate review.

"To have standing after the verdict to move for JNOV, a party must have made a directed verdict motion at trial on the specific issue which is the basis of the JNOV." *Lassiter v. English*, 126 N.C. App. 489, 492–93, 485 S.E.2d 840, 842 (1997) *overruled on other grounds, In re Will of Buck*, 350 NC 261, 629, 516 S.E.2d 858, 863 (1999); *accord Couch v. Private Diagnostic Clinic*, 133 N.C. App. 93, 100, 515 S.E.2d 30, 36 (1999). "A motion for a directed verdict shall state the specific grounds therefor." N.C. Gen. Stat. § 1A-1, Rule 50(a) (2011). Talecris asserted only two arguments in its motion for directed verdict: (1) the statute of frauds barred PCA's claim and (2) Talecris did not waive the opening deadline for the Stockton center. Talecris presented no other argument in support of its motion during the directed verdict hearing. Thus, Talecris lacked standing to raise additional issues before the trial court upon its motion for JNOV.

Talecris argues that the Supreme Court has held that "courts need not inflexibly enforce" the requirement for specificity in Rule 50(a) "when the grounds for the motion are apparent to the court and the parties." *Anderson v. Butler*, 284 N.C. 723, 729, 202 S.E.2d 585, 588 (1974), *abrogated on other grounds by Nelson v. Freeland*, 349 N.C. 615, 631–32, 507 S.E.2d 882, 892 (1998). In *Anderson*, the Court stated that it was "obvious that the motion challenged the sufficiency of the evidence to carry the case to the jury" and that "[t]here was no mis-apprehension on the part of the trial judge or the adverse parties as to the grounds for the motion." *Id.* at 729, 202 S.E.2d at 588–89. In this case, however, Talecris only argued two very specific grounds for its directed verdict motion. This would cause the trial court justifiably to disregard unasserted, but potentially viable, arguments in favor of a directed verdict. In complex civil cases such as this one, where the parties have argued multiple defenses and theories of liability, it is critical that the movant direct the trial court with specificity to the grounds for its motion for a directed verdict.

Because the arguments as to mutual assent and willing and able to perform the agreement were not properly raised at the time of the motion for directed verdict, we will not consider them for the first time on appeal. *See Jones v. Allred*, 52 N.C. App. 38, 46–47, 278 S.E.2d 521, 526 (refusing to address an argument on appeal because it was not argued in the defendants' directed verdict motion), *aff'd per curiam*, 304 N.C. 387, 283 S.E.2d 517 (1981); *Topper v. Topper*, 105 N.C. App. 239, 241, 412 S.E.2d 173, 174 (1992) (stating that arguments not properly raised at trial cannot be argued for the first time on appeal).

## 2.  Statute of Frauds

One of PCA's theories of liability was that the parties orally mod-ified the contract to provide that PCA was not required to comply with the center completion deadlines contained in Schedule 4 of the 2008 Agreement. PCA contends that, during each weekly status update meeting, the parties orally agreed to modify the completion deadlines in accordance with the completion dates listed on the sta-tus update slides. Talecris contends that any oral modification of the agreement is unenforceable under the statute of frauds because the 2008 Agreement requires the assignment of a lease of real property greater than three years. We conclude that the trial court correctly determined that the modification alleged by PCA was not barred by the statute of frauds.

The statute of frauds provides:

> All . . . contracts for leasing lands exceeding in duration three years from the making thereof, shall be void unless said contract, or some memorandum or note thereof, be put in writing and signed by the party to be charged therewith, or by some other person by him thereto lawfully authorized.

N.C. Gen. Stat. § 22-2 (2011). In this case, the party to be charged is Talecris. While this statute declares that certain contracts are "void" when they are not in writing, our courts have construed this to mean they are *voidable. Herring v. Volume Merch., Inc.*, 249 N.C. 221, 224, 106 S.E.2d 197, 200 (1958). If a contract falls within the statute of frauds, the party against whom enforcement is sought may generally avoid enforcement if there is no written memorandum of that party's assent to the contract. This rule also applies to the modification of contracts that must be in writing. *Concrete Mach. Co. v. City of Hickory*, 134 N.C. App. 91, 95, 517 S.E.2d 155, 158 (1999) (stating the oral modification of a contract that was required to be in writing was unenforceable).

The 2008 Agreement required Talecris to buy plasma centers from PCA if they complied with certain contractual criteria. Talecris asserts that if these criteria were met, the 2008 Agreement also required the assignment and assumption of the lease obligations for the land on which the centers were built. The assignment of a lease that lasts for more than three years after the making of the lease is subject to the statute of frauds. *Herring*, 249 N.C. at 225, 106 S.E.2d at 200. However, Talecris has not referred us to any provision in the 2008 Agreement document that even *references* the assignment of a lease. Nor have we discovered one.

Talecris argues that Gary Crandall, the owner of Bio-Medics and PCA, conceded at trial that he believed the 2008 Amendment included the assignment and assumption of lease obligations for the land upon which the centers were built. These leases, which are contained in the record, are for terms in excess of three years. But we are not persuaded that the 2008 Agreement required the assignment of a lease.

The 2008 Agreement contains the following provision: "This Agreement . . . contains the entire understanding of the parties with respect to the subject matter of this Agreement . . . . No rights or duties on the part of Talecris, Parent [or PCA] shall be implied, inferred or created beyond those expressly provided for in this

Agreement." When the intent of the parties "is expressed in clear and unambiguous language," a court may determine the parties' intent as a matter of law. *Wallace v. Bellamy*, 199 N.C. 759, 763, 155 S.E. 856, 859 (1930). The 2008 Agreement plainly states that no rights and duties were created other than those expressly stated in the 2008 Agreement. Nothing in the 2008 Agreement explicitly—or even implicitly—states that the assignment of a lease is required. Therefore, the trial court correctly concluded that this contract is not governed by the statute of frauds.

Because Talecris is barred from arguing that it did not agree to oral modifications made at the status update meetings, *supra* Section II.B.1, we will not disturb the jury's finding that Talecris agreed orally to modify the 2008 Agreement such that the deadlines contained in the status update slides superseded those in Schedule 4. We hold that the trial court did not err in denying Talecris's motion for JNOV. As a result, we do not reach Talecris's argument that it did not waive the Schedule 4 deadlines.[1]

### III. Motion for New Trial

[2] In its second argument, Talecris contends that the trial court erred in denying its motion for new trial as to damages. We disagree.

### A. Standard of Review

Generally, "[a] motion for new trial is addressed to the sound discretion of the trial judge." *Watts v. Schult Homes Corp.*, 75 N.C. App. 110, 111, 330 S.E.2d 41, 41 (1985). But when the grant or denial of a motion for new trial is based on a question of law, we review the trial court's decision *de novo*. *See id.* at 111, 330 S.E.2d at 41–42.

### B. Analysis

The jury awarded PCA damages in the amount of $37 million. The amount of this verdict is based upon income[2] PCA would have

---

1. Several aspects of waiver differentiate it from the oral modification of a contract. 13 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 39:16, at 567 (4th ed. 2000) ("[U]nlike modification of a contract, the efficacy of a waiver of contractual rights is generally not thought to require special tokens of reliability, such as a writing, consideration, reliance, judicial screening, or a heightened standard of proof.").

2. The parties disagree over whether the damages awarded were "lost profits." We need not address that question. Talecris's argument is that the jury's damages calculation rested on the faulty premise that PCA would have performed in a timely manner. Other than that issue, Talecris does not quibble with the amount awarded by the jury. *See infra.*

allegedly realized from the completion of the contract. Talecris argues that the trial court should have granted its motion for new trial on the issue of damages because PCA failed to establish these profits with reasonable certainty.

A party claiming damages from a breach of contract must prove its losses with "reasonable certainty." *Matthews v. Davis*, 191 N.C. App. 545, 551, 664 S.E.2d 16, 20 (2008) (citing *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 546, 356 S.E.2d 578, 585 (1987)). "While the reasonable certainty standard requires something more than 'hypothetical or speculative forecasts,' it does not require absolute certainty." *Id.* at 551, 664 S.E.2d at 21 (quoting *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 407–08, 466 S.E.2d 324, 329 (1996)). "[D]amages for lost profits will not be awarded based on hypothetical or speculative forecasts." *McNamera*, 121 N.C. App. at 407–08, 466 S.E.2d at 329. The amount of damages is generally a question of fact, but whether that amount has been proven with reasonable certainty is a question of law we review *de novo*. *See Matthews*, 191 N.C. App. at 551, 664 S.E.2d at 21 (citing *Olivetti*, 319 N.C. at 548, 356 S.E.2d at 586–87).

PCA offered expert testimony explaining how PCA would satisfy the Conditional Purchase Obligation in the contract by producing sufficient plasma following each center's opening.[3] Talecris contends that the damages estimations offered by PCA rest on the faulty premise that all eight plasma centers would be open and producing plasma in time to trigger the "Conditional Purchase Obligation" in the 2008 Agreement. Talecris does not challenge PCA's *calculation* of the damages; it argues that PCA could not have satisfied the conditions necessary to *trigger* recovery.

The Conditional Purchase Obligation clause provides: "Talecris shall have the obligation to purchase each Talecris Designated Center which satisfies each of the Purchase Requirements (defined below) on or prior to the date which is eighteen (18) months following such center's opening (such date, the "Deadline Date") . . . ." The jury found that the parties modified the opening dates that were listed in Schedule 4. The trial court correctly rejected Talecris's attack on this ruling at the directed verdict and JNOV stages. *Supra* Section II.B. Talecris does not argue on appeal that it is entitled to a new trial on this ground. Thus, for our consideration of Talecris's new trial argument, the modified

---

3. Eric Segal testified as an expert regarding projections of plasma collections, but he was not permitted to testify as an expert regarding projected opening dates for the centers.

deadlines from the final team meeting on 21 August 2008 are applicable. The only issue raised by Talecris is whether it was reasonably certain that PCA would have performed by those deadlines.

The forecasted opening schedule from the last weekly status meeting indicated that one center, in San Bernardino, California, was already open. The scheduling slide provided the following opening dates for the other centers:

- Sacramento-Florin Road: 7 October 2008

- Fresno: 25 November 2008

- Sacramento-Northgate: 4 November 2008

- Saturn-Indianapolis: 16 September 2008

- Modesto: 21 October 2008

- Stockton: 11 November 2008

- Titan-Anderson: 8 September 2008

The document indicated that two of the centers, Stockton and Sacramento-Northgate, were "at-risk" of missing their deadlines. (The opening dates were highlighted in red.) At trial, Eric Segal testified that these centers would likely open within a few weeks of the deadlines because most of the work "had already been done or was progressing along."[4] Internal documents prepared by Talecris estimated that the opening date for the Stockton center was 6 November. The estimated date for the Sacramento center was 8 October.[5] At trial, Moose testified that Talecris tended to use conservative estimates for the documents, i.e. the reports would err on the side of predicting PCA would take longer than needed to complete the centers.

Equis provided a construction tracking document on 21 August. That document projected site opening dates for four centers:

- Indianapolis: 23 September 2008

- Anderson: 8 September 2008

---

4. Segal was not testifying as an expert when he made this statement. *See supra* note 3.

5. This document has the two Sacramento centers listed as "Sacramento 1" and "Sacramento 2." The Sacramento 1 center's date is listed as 5 September; Sacramento 2 is listed as 8 October. We assume that Sacramento 2 refers to Sacramento-Northgate, because the projection slide, which was reviewed in the meeting between parties, had a later opening date for Sacramento-Northgate.

- Modesto: 25 October 2008

- Stockton: 29 October 2008

Talecris instructed Equis to "drive the project to on time completion," and it appears that Equis felt it was on pace to do so based on the latest deadlines. These completion estimates were based on completed and scheduled construction benchmarks.

Even though some of the documents at trial indicated the centers would not be completed by the applicable deadlines, the 2008 Agreement contained a thirty-day cure provision. Thus, PCA would have an additional thirty days from the applicable deadlines—not those contained in Schedule 4—to open the centers. We conclude that PCA presented sufficient evidence to establish that it was reasonably certain that the centers would be open in time to satisfy the Conditional Purchase Obligation.

This argument is without merit.

## IV.  Conclusion

We do not consider Talecris's mutual assent and ready and able to perform JNOV arguments because they were not raised in Talecris's motion for directed verdict. The trial court did not err in denying Talecris's motion for JNOV because it correctly determined that the statute of frauds did not govern the 2008 Amendment. The trial court did not err in denying Talecris's motion for a new trial because it was reasonably certain that the plasma center would have been open and producing plasma in time to comply with the deadlines as amended during the status update meetings.

The judgment and orders appealed from are

AFFIRMED.

Judge CALABRIA concurs.

Judge BEASLEY concurs in result only.