Shaw v. Gee, 2018 NCBC 108.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 3878

JAMES S. SHAW in the right of
GVEST PARTNERS, LLC, a North
Carolina Limited Liability Company,

              Plaintiff,

v.

RAYMOND M. GEE,

              Defendant.

**ORDER AND OPINION ON
PLAINTIFF'S POST-TRIAL MOTION**

1. Plaintiff James Shaw and Defendant Raymond Gee are former business partners—the co-members and co-managers of Gvest Partners, LLC ("Gvest"). In this derivative action, Shaw contends that Gee usurped a business opportunity belonging to Gvest, thereby breaching his fiduciary duty. After a seven-day trial, the jury found that Gee did so but that the doctrine of unclean hands barred Shaw's claim. Following the entry of final judgment, Shaw moved for judgment notwithstanding the verdict ("JNOV") or, alternatively, for a new trial. For the reasons set forth below, the Court **DENIES** the motion.

> *Robinson, Bradshaw & Hinson, P.A., by Julian H. Wright, Jr. and Stuart L. Pratt, for Plaintiff James S. Shaw.*
>
> *Baucom, Claytor, Benton, Morgan & Wood, P.A., by Rex C. Morgan, for Defendant Raymond M. Gee.*

Conrad, Judge.

## I.
## BACKGROUND

2.    A previous opinion describes Shaw's allegations and claims for relief. *See Shaw v. Gee*, 2016 NCBC LEXIS 103 (N.C. Super. Ct. Dec. 21, 2016). Here, the Court summarizes the trial testimony and other evidence, along with a brief description of the procedural posture.

### A. Evidence at Trial

3.    Shaw and Gee met as students at the University of Oklahoma but lost touch after graduation. Many years later, they reconnected and decided to do business together. Among other ventures, they formed Gvest in 2011 to buy, develop, and sell real estate. Shaw provided most of the capital for Gvest's investments, and Gee found and evaluated potential deals. On occasion, Shaw also lent Gee the money necessary to make his share of capital contributions to Gvest. As equal co-members and co-managers, though, neither had sole control of the entity. (*See* Shaw Tr. Ex. 1 § 4.3, Ex. 2.)

4.    This case concerns Gvest's interest in developing roughly 700 acres of land—referred to as either Sherrills Ford or Key Harbor—along the northwest shore of Lake Norman in Catawba County. In August 2013, Gvest signed an agreement to purchase the 700 acres for $6.5 million. (Shaw Tr. Ex. 3.) Gvest's plan was to develop the property with investments from Shaw and Tyson Rhame, one of Shaw's business associates. Shaw, Gee, and several Gvest employees conducted due diligence for roughly six months, at a cost of $243,000. These "hard costs" covered expenses for attorneys, land planners, civil engineers, and environmental studies but excluded any

amounts for Gvest's time and effort.  Shaw and Gee each made loans to Gvest to cover the due-diligence costs.

5.      During this period, the relationship between Shaw and Gee grew tense. Shaw accused Gee of absenteeism; Gee believed Shaw was exerting his economic leverage more as an adversary than as a co-manager.  By early 2014, this personal friction had paved the way for a serious business quarrel.  Shaw expressed his fear that Gvest's developer, John Bell, would leave the company over difficulties in working with Gee. (Gee Tr. Ex. 37 at 1.)  Shaw also believed Gee had agreed to reduce his equity in one of their projects (known as Yards at NoDa) and that this equity would be offered to Bell as an incentive to stay.  (Shaw Tr. Ex. 14 at 5.)  But Gee denied any such agreement and refused to cede his equity to Bell.  (Shaw Tr. Ex. 14 at 3.)  In a heated e-mail exchange on March 10, 2014, Shaw demanded to be "immediately reimbursed" for the loans he had made to Gee.  (Shaw Tr. Ex. 14 at 2.) He also told Gee that he was "over with this relationship" and "through" with Gee. (Gee Tr. Ex. 37 at 1.)

6.      That same day, Shaw directed Gvest's Chief Financial Officer, Kevin Frericks, to instruct Gee to terminate the Sherrills Ford contract.  (Gee Tr. Ex. 37 at 2.)  Shaw testified that he made this decision because the economics of the deal were unfavorable.  Gee, on the other hand, testified that Shaw's decision was personally motivated and that Frericks's instruction put him in a bind, jeopardizing Gvest's ability to recover the $243,000 in hard costs it had incurred.  Gee sought new investors to take over the contract, eventually arranging for it to be assigned to an

entity owned by Rhame. As a result, Shaw recovered his $1.5 million investment, and Gvest was reimbursed for its hard costs. (*See* Shaw Tr. Ex. 3.)

7. The decision to pull out of the Sherrills Ford deal and transfer it to Rhame also led to another dispute—whether Gvest should accept a fee, which Rhame was willing to pay, for its time and effort on the transaction. Gee favored doing so, but Shaw refused. Shaw's reason, Gee testified, was that he had an existing business relationship with Rhame and hoped to do more deals with Rhame in the future. Frericks also testified that, generally, Shaw did not want to charge Rhame fees. According to Gee, he had no option but to go along with Shaw's decision.

8. Gee conveyed all of this to Rhame, grumbling about how hard he had worked on the deal only to receive nothing in return. Rhame responded that Shaw's decision was unfair and that he would "take care of" Gee. Over the next few weeks, Rhame asked Gee several times what the normal compensation would be for the type of work he had done on the Sherrills Ford transaction. Gee demurred at first but eventually said $300,000.

9. On March 20, 2014, Rhame closed the Sherrills Ford transaction. The following day, Shaw asked to see the closing statement to ensure no fees other than the $243,000 for due diligence costs were being paid to Gvest. The closing statement reflected no payment for Gvest's time and effort.

10. A few weeks passed. During this time, Gee and his associate, Adam Martin, began working more closely with Rhame. They assisted with several projects, including the potential acquisition of a telecommunications company, referred to as

the BCM/Setel deal. After performing roughly seventy hours of consulting work, Gee and Martin advised against making the deal, and Rhame agreed. Gee and Martin also continued to assist Rhame with Sherrills Ford after he closed on the property, working with Catawba County officials on various matters and evaluating a possible conservation easement.

11. On April 10, 2014, Gee and Martin visited Rhame at his home, and Rhame wrote one check to Gee for $200,000 (made out to Gee Real Estate, LLC) and another check to Martin for $100,000 (made out to NAV Real Estate, LLC). (Shaw Tr. Exs. 34, 35.) The purpose of the checks was vigorously disputed at trial. Gee and Martin each testified that the payments were solely for their work on the BCM/Setel deal. They highlighted the checks' memo lines, which read "BCM ACQUISITION CONSULTING FEE." (Shaw Tr. Exs. 34, 35.) Shaw, on the other hand, alleged that the combined $300,000 was, in fact, a payment for Gvest's work on the Sherrills Ford deal—a payment that should have been disclosed and made to Gvest. Shaw pointed to Rhame's testimony that the checks were intended for work on the Sherrills Ford deal and also to a series of e-mails between Gee and Martin, in which each appears to refer to the payments as compensation for Sherrills Ford, split one-third to Martin and two-thirds to Gee. (*See* Shaw Tr. Ex. 47 at 6, 9.)

12. While all of this was taking place, Shaw and Gee were also negotiating an end to their business relationship, including a division of Gvest and other jointly owned entities. The resulting Dissolution and Separation Agreement ("Separation Agreement") contained a mutual release, in which Shaw and Gee "discharge[d] each

other from any other rights, claims or interest related to Gvest." (Shaw Tr. Ex. 43 § VI.) The Separation Agreement was executed on April 24, 2014. (Shaw Tr. Ex. 43.) At no time during the negotiation of the Separation Agreement was Shaw aware of the April 10 payments.

13. When Rhame disclosed the payments to Shaw about a year later, Shaw sent a demand letter, stating that the $300,000 should have been paid to Gvest and requesting that Gvest take action to recover the funds. Gvest did not bring suit, and Shaw initiated this derivative action.

## B. Procedural Posture

14. Trial began on February 5, 2018. Shaw asserted two claims for relief. He asserted, first, a derivative claim for breach of fiduciary duty, alleging that Gee usurped a business opportunity belonging to Gvest when he accepted payment from Rhame. Second, Shaw sought a declaration that the release in the Separation Agreement is unenforceable because, during negotiations, Gee fraudulently concealed the payment he received from Rhame. (ECF Nos. 10, 45.) Gee asserted several affirmative defenses, including unclean hands, waiver, equitable estoppel, and ratification.

15. At the close of all evidence, Shaw moved for a directed verdict on each of Gee's affirmative defenses. As to waiver, estoppel, and ratification, Shaw argued that the evidence was insufficient to support a verdict in Gee's favor. As to unclean hands, Shaw did not challenge the sufficiency of the evidence. Instead, he argued that the defense was inapplicable because unclean hands is a defense to claims for equitable

relief but his claim for breach of fiduciary duty is a legal claim for money damages. The next day (a Saturday), in an e-mail to the Court and opposing counsel, Shaw's counsel conceded that this argument was incorrect and that the derivative claim for breach of fiduciary duty was equitable in nature. When trial resumed, the Court denied Shaw's motion for directed verdict as to unclean hands and granted his motions as to waiver, estoppel, and ratification.

16. During the charge conference, Shaw did not object to the Court's proposed jury instructions or the verdict sheet. On unclean hands, the Court framed the issue as follows: "Did James Shaw act in such an unfair way regarding payment to Gvest Partners, LLC for the company's services in connection with the Sherrills Ford/Key Harbor transaction that, in fairness, Mr. Shaw should be denied the relief he seeks in this lawsuit?" (Jury Instructions 8–9, ECF No. 84; *see also* Verdict Sheet, Issue No. 3, ECF No. 85.)

17. The jury returned a unanimous verdict. The jury found that Gee breached his fiduciary duty to Gvest and that he fraudulently induced Shaw to enter into the Separation Agreement. (Verdict Sheet 2, 3.) The jury also found for Gee on his unclean-hands defense, barring Shaw's claim for breach of fiduciary duty. (Verdict Sheet 4.) As a result, the jury did not reach the issue of damages. (Verdict Sheet 5.) On March 14, 2018, the Court entered final judgment for Gee on Shaw's claim for breach of fiduciary duty and for Shaw on his claim for declaratory judgment. (ECF No. 91.)

18.    Shaw moved for judgment notwithstanding the verdict, or alternatively, for a new trial on March 26, 2018.  (ECF No. 92.)  The motion has been fully briefed, and the Court held a hearing on May 18, 2018.  The motion is ripe for resolution.

II.
ANALYSIS

19.    Shaw contends that the jury's verdict that he came into court with unclean hands is defective.  "The doctrine of clean hands is an equitable defense which prevents recovery where the party seeking relief comes into court with unclean hands."  *Ray v. Norris*, 78 N.C. App. 379, 384, 337 S.E.2d 137, 141 (1985).  The doctrine "denies equitable relief only to litigants who have acted in bad faith, or whose conduct has been dishonest, deceitful, fraudulent, unfair, or overreaching in regard to the transaction in controversy."  *Collins v. Davis*, 68 N.C. App. 588, 592, 315 S.E.2d 759, 762 (1984), *aff'd*, 312 N.C. 324, 321 S.E.2d 892 (1984).  It "does not extend to that party's general character."  *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 619, 730 S.E.2d 763, 766 (2012).  And the defense is "only available to a party who was injured by the alleged wrongful conduct."  *Ray*, 78 N.C. App. at 385, 337 S.E.2d at 142.

20.    According to Shaw, the evidence at trial was insufficient to support the jury's findings that his unfair conduct: (1) was specifically connected to the relief sought; (2) proximately caused injury to Gee; and (3) was sufficiently unfair to warrant barring his claim.  (*See* Pl.'s Br. Supp. 9, 11–13, ECF No. 93.)  Additionally, Shaw argues that his own unclean hands should not bar a recovery on behalf of Gvest

because Gvest's hands are clean.  (*See* Pl.'s Reply Br. 4, ECF No. 96.)  These four grounds, Shaw contends, support judgment in his favor or, alternatively, a new trial.

A.  <u>JNOV</u>

21.    The Court turns first to the request for judgment notwithstanding the verdict.  The threshold question is whether Shaw preserved any of the grounds stated in his motion.  After careful consideration, the Court concludes that he did not.

22.    "A motion for judgment notwithstanding the verdict is essentially a renewal of an earlier motion for directed verdict."  *Scarborough v. Dillard's, Inc.*, 363 N.C. 715, 720, 693 S.E.2d 640, 643 (2009) (quotation marks omitted).  By rule, a party may seek a directed verdict at the close of the opposing party's evidence.  *See* N.C. R. Civ. P. 50(a).  The motion for a directed verdict must "state the specific grounds therefor"—a way of giving notice to the other party of possible defects and an opportunity to cure.  *Id.*; *see also Garrison v. Garrison*, 87 N.C. App. 591, 595–96, 361 S.E.2d 921, 924 (1987).  If the trial court does not grant a directed verdict, the party may renew its motion after the jury returns its verdict but may not assert new grounds (which, if permitted, would defeat the notice function of the "specific grounds" requirement).  *See* N.C. R. Civ. P. 50(b)(1).  Thus, "[t]o have standing after the verdict to move for JNOV, a party must have made a directed verdict motion at trial on the specific issue which is the basis of the JNOV."  *Plasma Ctrs. of Am., LLC v. Talecris Plasma Res., Inc.*, 222 N.C. App. 83, 87, 731 S.E.2d 837, 841 (2012) (citation and quotation marks omitted).

23.     At trial, Shaw moved for directed verdict on a single, specific ground—a ground he later abandoned.  Shaw argued that the doctrine of unclean hands applies only when the plaintiff seeks an equitable remedy but that his derivative claim for breach of fiduciary duty was instead a legal claim for money damages.  The Court questioned Shaw's counsel on the distinction between legal and equitable remedies and apprised both parties of authority holding that derivative claims are equitable in nature.  *See, e.g.*, *Anderson v. Seascape at Holden Plantation, LLC*, 241 N.C. App. 191, 204, 773 S.E.2d 78, 87 (2015); *see also Collier v. Bryant*, 216 N.C. App. 419, 427, 719 S.E.2d 70, 78 (2011) ("Equitable defenses, including . . . unclean hands may be available to [defendant] and may bar plaintiffs' tort claims for fraud and breach of fiduciary duty.").  The following day, Shaw's counsel reversed course, conceding in an e-mail to the Court and opposing counsel that Shaw's claim was in fact an equitable claim.

24.     Shaw offered no other grounds to support his motion for directed verdict as to Gee's unclean-hands defense.  Having failed to do so and having abandoned the only argument he did make, Shaw may not raise new grounds in his JNOV motion.  *See, e.g.*, *Plasma Ctrs. of Am.*, 222 N.C. App. at 87, 731 S.E.2d at 841; *Brooks v. Wal-Mart Stores, Inc.*, 139 N.C. App. 637, 650–51, 535 S.E.2d 55, 64 (2000); *Munie v. Tangle Oaks Corp.*, 109 N.C. App. 336, 342, 427 S.E.2d 149, 152 (1993).

25.     In his reply brief, Shaw points to appellate precedent holding that courts "need not inflexibly enforce" Rule 50(a)'s "specific grounds" requirement "when the grounds for the [directed-verdict] motion are apparent to the court and the parties."

*Anderson v. Butler*, 284 N.C. 723, 729, 202 S.E.2d 585, 588 (1974), *overruled on other grounds by Nelson v. Freeland*, 349 N.C. 615, 507 S.E.2d 882 (1998). Shaw contends that these cases apply here because he "generally announced that he was moving for directed verdict" and "it was obvious that the motion also challenged the sufficiency of" the evidence. (Pl.'s Reply Br. 4–5.)

26. To the extent Shaw intended to raise unstated grounds, though, it was far from obvious. At no point did Shaw's counsel suggest that the evidence of unclean hands would be legally insufficient if his derivative claim were the type of equitable claim subject to the defense. By contrast, when counsel addressed Gee's other affirmative defenses, he expressly challenged the sufficiency of the evidence as to all three.

27. It is unclear what else could have put the Court or Gee on notice of additional grounds. Shaw did not, for example, move for summary judgment. Though permitted to do so, Shaw did not propose a jury instruction for unclean hands or object to the Court's instruction. (*See* Pl.'s Proposed Jury Instructions, ECF No. 69.) And when Shaw withdrew his one and only ground for directed verdict as to that defense, he did not request a chance to pose new grounds.

28. The Court did not then, and does not now, understand Shaw's directed-verdict motion as to unclean hands to include the grounds raised for the first time in his JNOV motion. When, as here, a party states "very specific grounds for its directed verdict motion[,]" it is reasonable "to disregard unasserted, but potentially viable arguments in favor of a directed verdict." *Plasma Ctrs. of Am.*, 222 N.C. App.

at 88, 731 S.E.2d at 841; *see also Maitra v. Quarter Mile Muscle, Inc.*, 2017 N.C. App. LEXIS 479, at \*8–10 (N.C. Ct. App. 2017) (unpublished) (affirming denial of JNOV when defendant failed to preserve grounds through directed-verdict motion or appropriate challenges to jury instructions); *Geoscience Grp., Inc. v. Waters Constr. Co.*, 234 N.C. App. 680, 691, 759 S.E.2d 696, 703 (2014) (same); *Estate of Smith v. Underwood*, 127 N.C. App. 1, 16, 487 S.E.2d 807, 817 (1997) (same); *Lassiter v. English*, 126 N.C. App. 489, 493, 485 S.E.2d 840, 843 (1997) (reversing grant of JNOV when movant challenged negligence claim but not specifically proximate causation), *overruled on other grounds by In re Will of Buck*, 350 N.C. 621, 629, 516 S.E.2d 858, 863 (1999).

29. The Court also denies Shaw's alternative request to excuse his failure to preserve a challenge to the injury element of the unclean-hands defense. (*See* Pl.'s Reply Br. 6.) Although Shaw claims he was misled by the Court's initial draft instructions (which did not recite the injury element), the Court circulated those tentative instructions for the purpose of receiving feedback from the parties and to reduce the number of disputes before the formal charge conference. Shaw and his counsel were aware that the instructions were not final, and he was not relieved of his own obligation to research the law. And in any event, the Court circulated its final instructions, which included the injury element, well in advance of the charge conference, before putting its ruling on the directed-verdict motion on the record, and before submitting the case to the jury. Shaw could have sought to modify or clarify his directed-verdict motion before the charge conference, but he did not.

30. In short, Shaw did not preserve the grounds asserted in his request for JNOV. The Court therefore denies Shaw's motion to the extent he seeks judgment notwithstanding the verdict.

### B. New Trial

31. A directed-verdict motion is not a prerequisite for seeking a new trial under Rule 59(a). *See Garrison*, 87 N.C. App. at 595, 361 S.E.2d at 924. Thus, although Shaw has not preserved any grounds for securing a judgment in his favor, the Court must decide whether his arguments nonetheless justify setting aside the verdict.

32. The power to grant a new trial is entrusted to the discretion of the trial court—discretion that "must be used with *great care and exceeding reluctance*." *In re Will of Buck*, 350 N.C. 621, 626, 516 S.E.2d 858, 861 (1999). The "verdict should be liberally and favorably construed with a view of sustaining it, if possible." *Piazza v. Kirkbride*, 246 N.C. App. 576, 580, 785 S.E.2d 695, 698 (2016) (quotation marks omitted). And the trial court should set aside a jury verdict only in "those exceptional situations where the verdict is contrary to the evidence presented and will result in a miscarriage of justice." *In re Will of Buck*, 350 N.C. at 628, 516 S.E.2d at 862.

33. Here, the Court instructed the jury that Gee must prove two elements: first, "that Mr. Shaw's conduct with regard to payment to Gvest Partners for the company's services in connection with the Sherrills Ford/Key Harbor transaction was in bad faith, dishonest, deceitful, fraudulent, unfair, or overreaching"; and second, "that Mr. Shaw's conduct proximately caused injury to Mr. Gee." (Jury Instructions 9.) If the jury found that Gee met his burden of proof, it was then required to weigh all the

evidence to determine whether, "on balance, Mr. Shaw acted in such an unfair way regarding payment to Gvest Partners for the company's services in connection with the Sherrills Ford/Key Harbor transaction that, in fairness, Mr. Shaw should be denied the relief he seeks in this lawsuit." (Jury Instructions 9.)

34. Shaw did not object to these instructions at trial. He now argues that the jury manifestly disregarded the instructions and that the evidence was insufficient to justify the verdict on each required element. *See* N.C. R. Civ. P. 59(a)(5), (7). In addition, Shaw argues that his own unclean hands should not prevent him from seeking relief on behalf of Gvest because Gvest's hands are clean. (*See* Pl.'s Reply Br. 4.)

1. Whether Shaw's Conduct Related to the Sherrills Ford Fee and Was Sufficiently Unfair to Bar His Claim.

35. The doctrine of unclean hands bars a plaintiff's claim only when his wrongful conduct relates to the matter in which he seeks relief. *See, e.g.*, *Collins*, 68 N.C. App. at 592, 315 S.E.2d at 762. "A person is not barred from his day in court in a particular case because he acted wrongfully in another unrelated matter or because he is generally immoral." *High v. Parks*, 42 N.C. App. 707, 711, 257 S.E.2d 661, 663 (1979).

36. Shaw does not contend that the jury punished him for being generally immoral or having bad character. Indeed, the Court instructed the jury that the doctrine of unclean hands "does not extend to [a] party's general character," (Jury Instructions 9), and the jury is presumed to follow its instructions, *see, e.g.*, *Poole v. Copland, Inc.*, 348 N.C. 260, 264, 498 S.E.2d 602, 604 (1998).

37. In his reply brief, Shaw also appears to concede, wisely, that there is a connection between his conduct and the relief he seeks. (*See* Pl.'s Reply Br. 9.) The alleged inequitable conduct was Shaw's decision to prevent Gvest from accepting any fee for the work it performed on the Sherrills Ford deal. The key allegation underlying Shaw's claim is that Gee (and his associate, Martin) took a fee anyway, usurping a payment rightfully belonging to Gvest. Put another way, Shaw now seeks to recover the very same fee he vetoed. The two are obviously related.

38. What Shaw argues instead is that his conduct wasn't so unfair that it should bar his claim. (*See* Pl.'s Reply Br. 10–11.) Weighing the equities, though, is a classic jury question. Whether Shaw committed "an unconscionable act" and whether his actions were "more egregious" than Gee's "are questions of material fact to be decided by a jury and not by the court." *Ferguson v. Ferguson*, 55 N.C. App. 341, 347, 285 S.E.2d 288, 292 (1982) (citation omitted); *see also Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co.*, 211 N.C. App. 252, 265, 712 S.E.2d 670, 680 (2011). In finding for Gee, the jury necessarily found that Shaw's conduct was sufficiently inequitable to bar his claim.

39. Substantial evidence supports the jury's verdict. It appears to be undisputed that Rhame would have paid Gvest for its time and effort if Shaw had not prevented it. The jury also heard evidence that Shaw vetoed the fee to bolster his own business relationship with Rhame—a benefit to Shaw at Gvest's expense. Although Shaw insists that his decision not to charge a fee could have benefitted Gvest, too, that seems doubtful. (*See* Pl.'s Reply Br. 10–11.) By that point, Shaw and

Gee had already begun talks to dissolve Gvest. In fact, Shaw's veto came on the heels of declaring he was "through" with Gee and "over with this relationship." (Gee Tr. Ex. 37.) From this evidence, the jury could have reasonably concluded that Gvest had no long-term prospects, that accepting a fee would have benefitted Gvest, that improved relations with Rhame would not have done so, and that Shaw vetoed the fee, to Gvest's detriment, because he stood to gain personally by doing so. The jury also could have concluded that Shaw's decision to put his own interest ahead of Gvest's, despite owing it a fiduciary duty as its co-manager, was unfair or inequitable.

40. Shaw argues that this is insufficient to bar his claim because Gee had an equal say in Gvest's decisions and because he admitted to making a "strategic decision" to go along with Shaw's preference not to charge Rhame. (*See* Pl.'s Br. Supp. 12; Pl.'s Reply Br. 10.) Neither argument is persuasive. Gee testified that he unwillingly went along with Shaw's decision because there was little else he could do. The jury could have concluded that the combination of Shaw's control of the purse strings and Gvest's equal co-management structure left Gee powerless because, once Shaw vetoed the fee, Gee had no authority to overrule that decision. In addition, Gee did not refer to his acquiescence as a "strategic decision." Those words were used by Shaw's counsel, to which Gee responded "[f]air enough if you want to put it that way." (Pl.'s Br. Supp. Ex. A at 111:17.) In context and taken as a whole, this evidence supports a conclusion by the jury that Gee disagreed with Shaw's decision to forgo a fee.

41. Given that the verdict finds a breach of fiduciary duty by Gee and unclean hands by Shaw, the jury appears to have concluded that neither of Gvest's managers acted in the company's best interests but instead favored their own—Shaw by vetoing the fee, Gee by taking it anyway. Although Shaw minimizes the unfairness of his own conduct, it was for the jury to decide whether his actions were sufficiently unfair to bar his claim. In weighing the evidence, the jury was free to view each party's actions in light of Gvest's management structure and their deteriorating relationship.

42. On one hand, the jury could have concluded that Shaw's actions were malicious and part of a broader effort to gain leverage over Gee as the two negotiated their business separation. The communications between Shaw and Gee during this time are filled with personal attacks. (*See* Shaw Tr. Exs. 14, 16.) And Shaw's refusal to allow Gvest to accept a fee from Rhame effectively denied Gee his share of the fee as one of Gvest's members, all at a time when Shaw was also ending their business relationship and demanding immediate repayment of loans he had made to Gee. The jury could have concluded that these facts aggravated the unfairness of Shaw's conduct.

43. On the other hand, the jury heard testimony from Rhame that he, not Gee, first suggested the idea of paying Gee for Gvest's work on Sherrills Ford because Rhame thought Shaw's decision to veto the fee was unfair. Rhame also testified that Gee did not ask to be paid, was reluctant to say what a typical fee would be, and never asked him to conceal the payment from Shaw. Assuming the jury credited this

evidence, it could have decided that Gee breached his fiduciary duty but also that there were mitigating circumstances.

44. The question is not whether the Court would have weighed the equities differently. It is instead whether the jury's verdict is so "exceptional" that it "will result in a miscarriage of justice." *In re Will of Buck*, 350 N.C. at 628, 516 S.E.2d at 862. Considering the evidence as a whole, it was not a miscarriage of justice for the jury to conclude that Shaw's wrongful acts were sufficiently unfair that he should be denied the relief sought.

2. Whether Shaw's Conduct Proximately Caused Injury to Gee.

45. The defense of unclean hands is "only available to a party who was injured by the alleged wrongful conduct." *Ray*, 78 N.C. App. at 385, 337 S.E.2d at 142. Shaw contends that, if anyone was injured by his conduct, it was Gvest because "Rhame's payment would have gone to Gvest, and not Gee individually, had it been properly disclosed . . . ." (Pl.'s Br. Supp. 10; *see also* Pl.'s Reply Br. 7.)

46. This argument ignores the economic realities of a two-member, equally owned limited liability company. Even Shaw concedes that Gee would have been entitled to half of any fee "as a 50% owner of Gvest." (Pl.'s Br. Supp. 9.) The loss of $150,000 is a real, concrete injury. That Shaw's conduct injured both Gee *and* Gvest does not suggest that his hands were clean.

47. Shaw also contends that any injury was illusory because Gee received from Rhame a $200,000 check—more than the $150,000 he would have received if a fee had been disclosed and paid to Gvest at the time of the Sherrills Ford closing. (Pl.'s

Br. Supp. 9.) Gee also capitalized on his relationship with Rhame by earning even more fees on other projects over the next year and a half. (*See* Pl.'s Br. Supp. 10 n.1; Pl.'s Reply Br. 8.) This, Shaw says, was a windfall, not an injury.

48. The Court disagrees. When the Sherrills Ford transaction closed, Gvest received no fee, depriving Gee of any share to which he would have been entitled. Gee's injury was complete at that time. The conduct Shaw points to includes Gee's later efforts to remedy his injury through self-help, some lawful and some unlawful. The jury presumably considered that when it weighed the equities, but it has little to do with whether Gee suffered an injury in the first place.

49. It is also unclear whether Gee fully remedied his injury (that is, his half of the $300,000 fee that Shaw vetoed), as Shaw contends. Although it is undisputed that Gee received $200,000 from Rhame, the parties sharply dispute what that payment was for. Some evidence, including Rhame's testimony, suggested that the entire amount was for Gvest's work on Sherrills Ford. But there was also evidence suggesting that the fee covered other work. The checks referred to the BCM/Setel deal. (Shaw Tr. Exs. 34, 35.) And Gee and Martin continued to work on the Sherrills Ford transaction after Gvest assigned the purchase agreement to Rhame. To conclude that Gee breached his fiduciary duty, the jury must have found that some part of the $200,000 should have gone to Gvest, but it may have found that Rhame paid Gee a single amount for several projects. If so, the Court sees no reason to disturb that finding.

50. The Court therefore concludes, in its discretion, that the evidence was sufficient to support the jury's verdict that Gee was injured by Shaw's unfair conduct.

### 3. Whether Shaw's Unclean Hands Should Bar Recovery on Behalf of Gvest if Gvest's Hands Were Clean.

51. Finally, Shaw argues that the verdict must be set aside even if the evidence was sufficient to show that his conduct was unfair or inequitable, that his conduct injured Gee, and that his conduct was more egregious than Gee's. (*See* Pl.'s Br. Supp. 15–19.) According to Shaw, his derivative claim belongs to Gvest, and Gvest's hands are clean, even if Shaw's are not. Put another way, it would be inappropriate "to allow a derivative plaintiff's unclean hands to bar the company's recovery in a derivative action." (Pl.'s Br. Supp. 15.)

52. Although this issue appears to be one of first impression in North Carolina, courts in other jurisdictions have held that unclean hands on the part of a derivative plaintiff will bar his claim. *See Straight v. Goss*, 678 S.E.2d 443, 458 (S.C. Ct. App. 2009) (collecting cases). The reason for this rule seems to be that the doctrine of unclean hands exists to protect the integrity of the courts, not only to benefit the opposing party. *See, e.g.*, *Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959). Shaw contends that North Carolina should depart from the majority rule, relying on a split in New York courts on the subject and on Delaware law concerning a different equitable doctrine (*in pari delicto*). *Compare Hilpert v. Yarmosh*, 77 A.D.2d 615, 616 (N.Y. App. Div. 1980), *with Tierno v. Puglisi*, 279 A.D.2d 836, 838–39 (N.Y. App. Div. 2001). *See also Stewart v. Wilmington Tr. SP Servs.*, 112 A.3d 271, 304 (Del. Ch.

2015), *aff'd*, 126 A.3d 1115 (Del. 2015); *In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1107 (Del. Ch. 2003).

53. The Court need not decide whether to join or depart from the majority rule, though, because Shaw failed to preserve the issue. Shaw's argument is an indirect objection to the jury instruction on unclean hands, which instructed the jury to determine whether *Shaw's* conduct, not *Gvest's*, was sufficiently unfair to bar his claim. (Jury Instructions 9; *see also* Verdict Sheet, Issue No. 3.) Shaw did not object to this instruction or to the issue as framed and submitted to the jury on the verdict sheet. By agreeing to an instruction that authorized the jury to find that Shaw's unclean hands barred his claim, Shaw waived his right to contend, after the verdict, that the jury was not so authorized, and the Court's instruction became the law of the case. *See, e.g.*, *Dixon v. Taylor*, 111 N.C. App. 97, 104, 431 S.E.2d 778, 781 (1993) (party failed to object to instructions on negligence).

54. Shaw insists that a new trial is required because, by following the Court's instruction, the jury's verdict was contrary to law. *See* N.C. R. Civ. P. 59(a)(7). But the time to challenge the jury instructions was before the jury retired, *see Hannah v. Brady*, 73 N.C. App. 521, 528, 327 S.E.2d 22, 26 (1985), and there is no such thing as "plain error" in civil cases, *see, e.g.*, *Durham v. Quincy Mut. Fire Ins. Co.*, 311 N.C. 361, 367, 317 S.E.2d 372, 377 (1984); *Zubaidi v. Earl L. Pickett Enters., Inc.*, 164 N.C. App. 107, 116, 595 S.E.2d 190, 195 (2004). A motion for new trial does "not . . . serve as a substitute for the obligation of counsel to timely object to the jury instructions." *Hannah*, 73 N.C. App. at 528, 327 S.E.2d at 26 (affirming denial of motion for new

trial because defendant "made no objection whatsoever during the judge's charge to the jury"); *see also Land v. Land*, 2012 N.C. App. LEXIS 893, at *29 (N.C. Ct. App. 2012) (unpublished); *Greene v. Royster*, 187 N.C. App. 71, 81–82, 652 S.E.2d 277, 284 (2007); *Out of the Box Developers, LLC v. Doan Law, LLP*, 2014 NCBC LEXIS 39, at *14 (N.C. Super. Ct. Aug. 29, 2014).

55.    Shaw remains free to argue that the jury misapplied the instructions to the facts (which he has done), but he forfeited his chance to argue that the jury should have applied a different legal standard altogether.  Having failed to "object to the verdict sheet or the jury instructions[,]" Shaw's argument is "barred as untimely." *Out of the Box Developers*, 2014 NCBC LEXIS 39, at *14.

**\*\*\*\*\***

56.    Throughout trial, the jury was attentive.  It listened carefully to the evidence and to the instructions given by the Court, which drew no objection from Shaw.  Having heard all the evidence, the jury concluded that each party had engaged in wrongful conduct and further concluded that Shaw's conduct was sufficiently inequitable that he should be denied relief.  The verdict was supported by the evidence, and this is not the exceptional situation in which the verdict will result in a miscarriage of justice.  Therefore, in its discretion, the Court denies Shaw's request for a new trial.

### III.
### CONCLUSION

57.    For the foregoing reasons, the Court **DENIES** Shaw's motion for JNOV or, alternatively, for a new trial.

This the 19th day of October, 2018.

                                 /s/ Adam M. Conrad
                                 Adam M. Conrad
                                 Special Superior Court Judge
                                  for Complex Business Cases