Miriam Equities, LLC v. LB-UBS 2007-C2 Millstream Rd., LLC, 2022 NCBC 3.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

MIRIAM EQUITIES, LLC, a New
Jersey Limited Liability Company,

          Plaintiff,

    v.

LB-UBS 2007-C2 MILLSTREAM
ROAD, LLC, a North Carolina Limited
Liability Company,

          Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 8523

**ORDER AND OPINION ON
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

## I.     INTRODUCTION

1. This case involves the attempted sale of commercial property in Guilford County, North Carolina (the "Property") by Defendant (also referred to as "Seller") to Plaintiff (also referred to as "Buyer"). The sale fell through when Plaintiff failed to meet the terms required to close in the Agreement for Sale and Purchase of Property (the "Agreement").

2. Plaintiff argues that it was prevented from closing because Defendant breached the Agreement by denying its request to exercise a contract right to access the Property "to conduct site inspections and investigations" so that it could secure funding (the "Access Right"). (Am. Verified Compl. ¶ 10, ECF No. 5.) Defendant responds that it did not breach the Agreement and argues alternatively that if a breach did occur, it was not material and does not excuse Plaintiff's failure to close.

3. Plaintiff further claims that, after these events, the parties agreed to new terms to close the sale. Defendant denies that the parties reached any new

agreement and counterclaims for a judgment declaring that Plaintiff breached the Agreement, Defendant has no further obligation to Plaintiff under the Agreement, and Defendant is entitled to retain Plaintiff's $1 million deposit as liquidated damages. Defendant also seeks its attorneys' fees and costs. (Mot. Dismiss, Answer, & Countercl. ¶¶ 13–22, ECF No. 7.)

4. Before the Court is Defendant LB-UBS 2007-C2 Millstream Road, LLC's Motion for Summary Judgment (the "Motion"), filed on 18 December 2020. (ECF No. 42.) Defendant contends that it is entitled to summary judgment with respect to both of Plaintiff's claims, as well as its own counterclaims. With the benefit of full briefing and a hearing on 2 November 2021, the Motion is ripe for determination.

5. Having considered the Motion, the briefs filed by the parties,[1] the arguments of counsel, and other relevant matters of record, the Court **GRANTS** Defendant's Motion, **DISMISSES** Plaintiff's action with prejudice, and **ENTERS JUDGMENT** for LB-UBS 2007-C2 MILLSTREAM ROAD, LLC as provided herein.

*Revolution Law Group, by C. Scott Meyers, for Plaintiff Miriam Equities, LLC.*

*Kilpatrick Townsend & Stockton LLP, by James H. Pulliam and Elizabeth L. Winters, for Defendant LB-UBS 2007-C2 Millstream Road, LLC.*

Earp, Judge.

---

[1] The Court granted the parties an opportunity to submit supplemental briefing on the Motion, (Ord. Pl.'s Mot. Leave File Surreply Br. & Modification Current Am. Case Management Ord. ¶ 5, ECF No. 59), but Plaintiff's Response to Defendant's Supplemental Brief in Support of its Motion for Summary Judgment, (ECF No. 79), was not timely submitted and, consequently, was not considered, (Ord. Pl.'s Mot. Ext. Time ¶ 12–13, ECF No. 80).

## II.    FACTUAL BACKGROUND

6.      The Court does not make findings of fact when ruling on motions for summary judgment.  Instead, the Court summarizes the material facts it considers to be uncontested.  *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142 (1975); *McGuire v. Lord Corp.*, 2021 NCBC LEXIS 4, at *2–3 (N.C. Super. Ct. Jan. 19, 2021).  The following background, describing the evidence and noting relevant disputes, is therefore intended only to provide context for the Court's analysis and ruling.[2]

7.      The right to purchase the commercial property at issue in this case was put up for auction.  (*See* Verified Compl. Ex. A, ECF No. 3 (describing the purchase as a "COMMERCIAL AUCTION" with "NO DUE DILIGENCE PERIOD").)  Plaintiff was the successful bidder.  (*See* Verified Compl. Ex. A § 1.3(a); Br. Supp. Mot. Summ. J. Ex. 2, ECF No. 44.2.)  Consequently, on 15 May 2019, Plaintiff and Defendant executed the Agreement.  (Verified Compl. Ex. A.)

8.      The Agreement contains several provisions designed to streamline the closing process.  It specifies, for example, that Plaintiff is "buying the Property 'as is, where is with all faults and limitations' " and with "no due diligence or inspection period[.]"  (Verified Compl. Ex. A, 1.)

---

[2] The Court provided additional procedural background in its Order and Opinion on Defendant's Motion for Sanctions, (ECF No. 83), filed on 1 November 2021.

9.    Section 3.5 adds that:

Buyer hereby acknowledges that prior to the Execution Date Seller provided Buyer sufficient opportunity to make such independent factual, physical, and legal examinations and inquiries as Buyer deemed necessary and desirable with respect to the Property and the transaction contemplated by this Agreement and that Buyer has approved the Property in all respects. *Any inspections conducted by Buyer after the Execution Date do not and shall not in any way relieve Buyer of any of its obligations under this Agreement*[.]

(Verified Compl. Ex. A § 3.5 (emphasis added).)  "Execution Date" is defined within the Agreement as "[t]he date set forth on the cover page of this Agreement, which date shall be the date Buyer has executed this Agreement in accordance with Section 13.4."  (Verified Compl. Ex. A § 2.1(k).)  The date on the cover page is 15 May 2019. (Verified Compl. Ex. A.)

10.    Importantly, the Agreement expressly states that "Buyer understands and acknowledges that the purchase of the Property and this Agreement IS NOT contingent on Buyer obtaining financing for the purchase of the Property."  (Verified Compl. Ex. A § 4.1(b) (emphasis in original).)

11.    Further, the parties agreed that time was of the essence with respect to their obligations under the Agreement.  (*See* Verified Compl. Ex. A § 13.12 ("Seller and Buyer expressly agree that time is of the essence with respect to this Agreement.").)

12.    The Agreement limits any recourse Buyer may have against Seller:

Notwithstanding any provision to the contrary in this agreement, Seller's liability and Buyer's sole and exclusive remedy in all circumstances and for all claims . . . arising out of or relating in any way to this Agreement or the sale of the Property to Buyer including, but not limited to, Seller's breach or termination of this Agreement, the

condition of the Property, Seller's title to the Property, the occupancy status of the property, the size, square footage, boundaries, or location of the property, any cost or expense incurred by Buyer in conducting its investigation and/or due diligence in preparation for the purchase of the property, obtaining other accommodations, moving, storage or relocation expenses, or any other costs or expenses incurred by Buyer in connection with this Agreement shall be limited as provided in Section 11.2 of this Agreement.

(Verified Compl. Ex. A, 1.)

13. Section 11.2 provides in pertinent part: "Buyer agrees that the Property is not unique and that in the event of Seller's default or material breach of the Agreement, Buyer can be adequately and fairly compensated solely by receiving a return of the Deposit and the Expenses." (Verified Compl. Ex. A § 11.2.)

14. However, in the event of Buyer's failure to close on the Property prior to the agreed-upon date, Section 11.1 of the Agreement provides that "the Deposit shall be paid over to Seller as agreed and [sic] liquidated damages and not as a penalty[.]" (Verified Compl. Ex. A § 11.1.)

15. After Plaintiff failed to meet its first deadline for a required deposit, the Agreement was amended on 28 May 2019 to make the deposit amount $1 million and to establish 3 July 2019 at 2:00 p.m. as the closing date and time. (Br. Supp. Mot. Summ. J. Ex. 4, ECF No. 44.4; *see* Verified Compl. Ex. A § 1.4; Chommie Aff. ¶ 4, ECF No. 44.1.)

16. It is undisputed that Plaintiff did not meet its obligations to close on July 3. Plaintiff contends that it was unable to do so because Defendant denied it access to the Property. (Am. Verified Compl. ¶ 10.) In testimony submitted in opposition to Defendant's Motion for Summary Judgment, Plaintiff explains that a

final site inspection, denied by Defendant, was required to secure the financing from its lender that Plaintiff needed to close. (Shapiro Aff. ¶¶ 9–10, ECF No. 47.2; Rubin Aff. ¶¶ 9–10, ECF No. 47.3; *see* Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 4, ECF No. 47.)

### A. **The Access Right**

17.     The "Access Right" is found in Section 3.2 of the Agreement:

Until the Closing Date, provided this Agreement is not terminated to the extent permitted herein, Buyer and Buyer's agents and contractors shall be entitled to enter upon the Property *at all reasonable times established by Seller, but only for the purpose of conducting tests and making site inspections and investigations.* In doing so, however, Buyer agrees (a) that no invasive testing may be conducted without Seller's prior consent, which may be withheld by Seller in its sole discretion, (b) not to cause any damage or make any physical changes to the Property and (c) not to interfere with the rights of Tenant, Subtenant or others who may have a legal right to use or occupy the Property.

(Verified Compl. Ex. A § 3.2 (emphasis added).)

18.     The parties agree that at some point close in time to the closing date, Buyer requested, and was denied, access to the Property. The exact timing and effect of the Buyer's request, however, is hotly disputed. Plaintiff's corporate representative, Sam Sprei, testified that he telephoned both the Seller's representatives and the Property's current tenant requesting access as early as June 25 or 26. (Sprei Dep. 66:20–69:7, ECF No. 79.1.)[3] Inconsistently, Plaintiff also submitted testimony by affidavit stating that July 2 was the date that Plaintiff

---

[3] The Court takes judicial notice of the transcript of the Sprei Deposition, (ECF 79.1), without regard to Plaintiff's Response to Defendant's Supplemental Brief in Support of its Motion for Summary Judgment, (ECF No. 79), which was untimely filed and, therefore, is not considered, (*see* Ord. Pl.'s Mot. Ext. Time ¶ 13).

telephoned Defendant requesting access to the Property. (Shapiro Aff. ¶ 10; Rubin Aff. ¶ 10.)

19. On the other hand, Lisa Chommie, asset manager for Defendant's agent, LNR Partners, LLC, testified that July 8 was the first time she received a request from Plaintiff for access to the Property. (Chommie Aff. ¶ 5.)

20. For purposes of the Motion, the Court views the evidence in the light most favorable to the nonmoving party, Plaintiff, and assumes as true Plaintiff's contention that it requested access on June 25 or 26. It is undisputed that Defendant denied Plaintiff's request.

21. It is further undisputed that Plaintiff was not prepared to close at 2:00 p.m. on July 3 as agreed. At 10:19 a.m. on the day of the scheduled closing, Eli Shapiro, acting for Plaintiff, wrote an email to Chommie and Ms. Nealon, another representative of Defendant, asking for an extension of time: "Lisa I am asking you to Pls [sic] try to make this exstion [sic] work." (Br. Supp. Mot. Summ. J. Ex. 6, ECF No. 44.6.) Later that afternoon Plaintiff was still unprepared to close. Shapiro responded to the escrow agent's request for an update at 1:58 p.m. with: "Working with lender attorney[.]" (Br. Supp. Mot. Summ. J. Ex. 7, ECF No. 44.7.)

22. It is undisputed that the closing did not occur at 2:00 p.m. on July 3. (Br. Supp. Mot. Summ. J. Ex. 4 ("First Amendment to Agreement for Sale and Purchase of Property").) Consequently, at 2:28 p.m. on July 3, Defendant's counsel sent a letter of default to Plaintiff. (Br. Supp. Mot. Summ. J. Ex. 8, ECF No. 44.8.)

B.  **The Alleged "Contract to Reinstate"**

23.     After the unsuccessful July 3 closing, in a 9 July 2019 email, Mr. Shapiro asked Chommie for a new closing date (July 24) in exchange for another deposit.  (Br. Supp. Mot. Summ. J. Ex. 10, ECF No. 44.10.)  Chommie did not immediately respond.

24.     The next communication in the record is an email from Chommie to Shapiro sent on 29 July 2019 making it clear that it was not her decision to accept or decline Plaintiff's offer and stating:

> I spoke to my boss and let him know your point which is I believe that there is a lot of available space that LabCorp can move into and we should take your offer.  I sent him the PDF's as well.  He came back and said the same thing to take the offer of the additional $1MM at risk and $500k extension fee.

(Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 5, ECF No. 47.6.)  Shapiro testified that he then "contacted Ms. Chommie on July 31, 2019 to resurrect the deal."  (Shapiro Aff. ¶ 14.)[4]

25.     On 12 August 2019, Chommie communicated to Shapiro that she would speak further with her boss and specified that, if the parties reached an agreement, she would need Malka Rubin's identification as Plaintiff's representative, as well as proof of Ms. Rubin's ability to execute an agreement on behalf of Plaintiff, in order to proceed.  (Br. Supp. Mot. Summ. J. Ex. 11, ECF No. 44.11.)

26.     The next day Chommie relayed to Shapiro that her senior management would agree to reinstate the deal for the original purchase price but would require a

---

[4] The content of this communication—if it occurred—is not in the record.

$1.2 million deposit and another $300,000 at closing as an extension fee. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 6, ECF No. 47.7.)

27. At 2:19 p.m. on August 13, Shapiro counteroffered by email back to Chommie: "[l]et's split the baby in half[.]" (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 6.) Without responding to the substance of the counteroffer, that same evening, Chommie reiterated that she would need proof of Ms. Rubin's authority to sign on behalf of Plaintiff. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 6.) Shapiro responded by attaching Plaintiff's operating agreement with Ms. Rubin's signature. (Br. Supp. Mot. Summ. J. Ex. 12, ECF No. 44.12.)

28. Finally, on August 15, Chommie reported to Shapiro that she "spoke with [her] bosses about this and they have decided not to move forward with the deal. There are too many inconsistencies in the documents provided and we are going in another direction with the asset." (Br. Supp. Mot. Summ. J. Ex. 13, ECF No. 44.13.)

29. The parties disagree regarding whether a Contract to Reinstate was formed as a result of these communications. In any event, the sale was never consummated, and this litigation ensued.

## III. PROCEDURAL BACKGROUND

30. The Complaint in this matter was filed on 13 September 2019. (Verified Compl., ECF. No. 3.) An Amended Verified Complaint asserting claims for Specific Performance, Declaratory Judgment, Unjust Enrichment, Breach of Contract, and Constructive or Equitable Lien was filed on 21 October 2019. (Am. Verified Compl., ECF No. 5.)

31.     Defendant answered the Amended Complaint on 6 November 2019, asserting a counterclaim for declaratory judgment and moving to dismiss Plaintiff's claims.  (Mot. Dismiss, Answer & Countercl., ECF No. 7; Defs.' Mot. Dismiss Pl.'s Verified Am. Compl. & Mot. Cancellation Lis Pendens, ECF No. 8.)

32.     On 6 December 2019, Plaintiff voluntarily dismissed its First Cause of Action for Specific Performance and its Fifth Cause of Action for Constructive or Equitable Lien.  Plaintiff also consented to the cancellation of Lis Pendens #19 M 2394, and it voluntarily dismissed all claims against defendants LNR Partners, LLC and U.S. Bank NA, leaving LB-UBS 2007-C2 Millstream Road, LLC as the remaining defendant.  (Vol. Dismissal Without Prej. & Cancellation Lis Pendens, ECF No. 11.)

33.     On 9 January 2020, the Court granted Defendant's Motion to Dismiss with respect to Plaintiff's Third Cause of Action for Unjust Enrichment.  (Ord. & Op. Mot. Dismiss ¶ 16, ECF No. 15.)  Therefore, the claims remaining to be decided are Plaintiff's Second Cause of Action for Declaratory Judgment and Plaintiff's Fourth Cause of Action for Breach of Contract.  Also remaining is Defendant's Counterclaim for Declaratory Judgment.

34.     On 18 December 2020, Defendant filed this Motion for Summary Judgment on "all claims and counterclaims remaining in this action."  (Mot. Summ. J., ECF No. 42.)

## IV.    LEGAL STANDARD

35.     "Summary judgment should be rendered 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " *Rose v. Guilford Cnty.*, 60 N.C. App. 170, 172 (1982) (quoting N.C. R. Civ. P. 56(c)).

36.     The burden is on the moving party to establish the "absence of any triable issue of fact[,]" and the moving party's "papers are meticulously scrutinized and all inferences are resolved against [it]." *Joel T. Cheatham, Inc. v. Hall*, 64 N.C. App. 678, 680 (1983) (citing *Kidd v. Early*, 289 N.C. 343, 352 (1976)). "A defendant is entitled to summary judgment [on a plaintiff's claims] only when he can produce a forecast of evidence, which when viewed most favorably to plaintiff would, if offered by plaintiff at trial, without more, compel a directed verdict in defendant's favor, . . . or if defendant can show through discovery that plaintiff cannot support his claim[.]" *Coats v. Jones*, 63 N.C. App. 151, 154 (citations omitted), *aff'd per curiam,* 309 N.C. 815 (1983).

37.     Affirmative summary judgment on a party's own claims for relief carries an even greater burden. *Brooks v. Mount Airy Rainbow Farms Ctr., Inc.*, 48 N.C. App. 726, 728 (1980). The moving party "must show that there are no genuine issues of fact, that there are no gaps in his proof, that no inferences inconsistent with his recovery arise from the evidence, and that there is no standard that must be applied to the facts by the jury." *Parks Chevrolet, Inc. v. Watkins*, 74 N.C. App. 719, 721 (1985). Therefore, it is "rarely . . . proper to enter summary judgment in favor of the party having the burden of proof." *Blackwell v. Massey*, 69 N.C. App. 240, 243 (1984);

*see Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc.*, 2021 NCBC LEXIS 61, at *10–11 (N.C. Super. Ct. June 30, 2021).

## V.     ANALYSIS

### A. <u>Plaintiff's Claims for Breach</u>

38.     Plaintiff claims it is entitled to a declaratory judgment establishing that Defendant breached the Agreement by denying its request to access the property in violation of the Access Right, thereby preventing Plaintiff from obtaining financing and being able to meet its obligations to close.  (Am. Verified Compl. ¶ 10; Shapiro Aff. ¶¶ 9–10; Rubin Aff. ¶¶ 9–10; *see* Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 4.)  It seeks the return of its $1 million deposit.

39.     Defendant responds that its decision to refuse Plaintiff's request for access was reasonable under the circumstances and was not a breach of the parties' Agreement.  (Def.'s Suppl. Br. Supp. Mot. Summ. J. 10–15, ECF No. 65.)  Moreover, because the language of the Agreement established that the property was to be taken "as is, where is with all faults and limitations" and with "no due diligence or inspection period," and because "[a]ny inspections conducted by Buyer after the Execution Date [did] not and shall not in any way relieve Buyer of any of its obligations under this Agreement" and "the purchase of the Property and this Agreement [was not] contingent on Buyer obtaining financing for the purchase of the Property," Defendant contends that if it did breach the Agreement, its breach was not material and did not relieve Plaintiff of its obligation to close on July 3.  (*See* Br. Supp. Mot. Summ. J. 9–10, ECF No. 43; Reply Supp. Mot. Summ. J. 8, ECF No. 54.)

### a. **Defendant's Access Denial**

40.     Defendant argues that it did not breach the Agreement because it was within its rights under the Agreement to decline Plaintiff's request for access for three reasons: (1) Plaintiff's request was not in writing; (2) Plaintiff's requests were too close to the closing date and were, therefore, not reasonable under the terms of the Agreement; and (3) Plaintiff's requested access was for an appraisal, but Section 3.2 only allowed access for "tests or inspections." (*See* Def.'s Suppl. Br. Supp. Mot. Summ. J. 10–15.)

41.     Of the three arguments, the Court agrees that there is no issue of fact with respect to the first, and it alone is sufficient to warrant summary judgment for Defendant.  Plaintiff's request to access the Property was required to be in writing.  Section 13.8 begins by stating: "*All notices, demands, requests, and other communications required or permitted* hereunder shall be in writing."  (Verified Compl. Ex. A § 13.8 (emphasis added).)   Plaintiff presents no evidence that any written request for access was presented to Defendant.  To the contrary, Plaintiff submits sworn testimony that the request was oral—by telephone. (Shapiro Aff. ¶ 10; Rubin Aff. ¶ 10.)

42.     Plaintiff argues that Section 13.8 does not specifically apply to the Access Right provision, and therefore, Plaintiff's requests to access the Property did not need to be in writing.  The argument lacks merit.  Nothing in the Agreement limits the application of Section 13.8 in the manner Plaintiff suggests.  The plain language of Section 13.8 is that "all" communications shall be in writing.  Accordingly,

there is no question that Plaintiff's oral requests to access the Property were ineffective, and Defendant did not breach the parties' Agreement when it denied them. *See State v. Philip Morris USA, Inc.*, 363 N.C. 623, 632 (2009) ("[W]hen the terms of a contract are plain and unambiguous, there is no room for construction. The contract is to be interpreted as written[] and enforce[d] . . . as the parties have made it[.]" (citations and internal quotation marks omitted)).[5]

---

[5] Separately, Defendant argues that a lease for the property in question giving its tenant the right to three business days' notice before the property is accessed makes Plaintiff's request on short notice unreasonable as a matter of law such that it could be denied without breaching the Agreement. The argument is unavailing. First, Defendant filed the lease but did not provide an affidavit authenticating it. The Court concludes, in response to Plaintiff's timely objection on the issue, that the unauthenticated lease agreement cannot be considered for purposes of this Motion. *Cf. Yamaha Int'l Corp. v. Parks*, 72 N.C. App. 625, 629 (1985) ("On a motion for summary judgment, uncertified or otherwise inadmissible documents may be considered *if not challenged by timely objection*." (emphasis added)). Furthermore, Plaintiff presented evidence through Mr. Sprei's deposition that Sprei, on behalf of Plaintiff, made requests (albeit by telephone) to access the Property as early as June 25 or 26. (Sprei Dep. 66:20–69:7.) Consequently, even if the "three business day" provision in the lease were considered, Sprei's testimony that the request was made more than three business days before the closing raises issues for a jury to decide absent summary judgment on other grounds. *Craddock v. Craddock*, 188 N.C. App. 806, 809 (2008) ("Summary judgment may not be used . . . to resolve factual disputes which are material to the disposition of the action." (quoting *Robertson v. Hartman*, 90 N.C. App. 250, 252 (1988))).

Defendant's argument that Plaintiff's request to access the Property for the purpose of appraising it was improper because Section 3.2 allows access only for "tests and inspections" is also unavailing. It is unclear from the evidence presented the exact purpose for which Plaintiff requested access. The Amended Complaint states that Plaintiff desired access to "conduct site inspections and investigations[,]" (Am. Verified Compl. ¶ 10), and Plaintiff's Response Brief explains that its lender needed to "visit" and "inspect" the property, (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 4, 7). On the other hand, Mr. Sprei testified that access was needed for a "verbal commitment" from the appraiser and noted the need to "get the appraisal and summary of one page opinion letter." (Sprei Dep. 78:3–4, 81:2–4.) Therefore, whether it requested access for a "test" or an "inspection" is another issue for a jury to determine if summary judgment were not otherwise appropriate. *Cf. Jones-Phillips Co. v. McCormick*, 174 N.C. 82, 83 (1917) ("The law does not regard the form of things so much as the substance, and it attaches little or no weight to the particular language used in a written instrument, provided that which is employed by the parties expresses their intention with specific clearness.").

43.     For these reasons, the Court concludes that Defendant did not breach the Agreement by denying an oral request for access.  Summary judgment on the second and fourth claims also depends, however, on a determination with respect to Plaintiff's allegation that a second contract was formed and then breached by Defendant.

### b. The "Contract to Reinstate"

44.     After the failed closing scheduled for 3 July 2019, Plaintiff alleges that the parties agreed to a "Contract to Reinstate" that "Defendant then breached . . . by refusing to accept [its] tender of payments or the agreed-upon proof of identity."  (Am. Verified Compl. ¶ 30.)   Defendant, on the other hand, argues that the parties' communications on this subject amounted to no more than abandoned negotiations and that no Contract to Reinstate was ever formed.  (*See* Br. Supp. Mot. Summ. J. 10–13.)

45.     It is black letter law that to form a contract, "it is necessary that the minds of the parties meet upon a definite proposition."  *Id.* (quoting *Elks v. N. State Ins. Co.*, 159 N.C. 619, 624 (1912)).  Moreover, "[t]o be binding, the terms of a contract must be definite and certain or capable of being so."  *Horton v. Humble Oil & Refining Co.*, 255 N.C. 675, 679 (1961) (quoting *Williamson v. Miller*, 231 N.C. 722, 728 (1950)); *see also Miller v. Rose*, 138 N.C. App. 582, 588 (2000) (stating that "a contract that leaves material portions open for future agreement is nugatory and void for indefiniteness" (citation and internal quotation marks omitted)).

46.     In addition to these requirements, the statute of frauds demands that contracts regarding the sale of real property be reduced to writing.  N.C.G.S. § 22-2 (requiring a contract or memorandum in writing "signed by the party to be charged therewith").  "If a contract falls within the statute of frauds, the party against whom enforcement is sought may generally avoid enforcement if there is no written memorandum of that party's assent to the contract.  This rule also applies to the modifications of contracts that must be in writing." *Plasma Ctrs. of Am., LLC v. Talecris Plasma Res., Inc.*, 222 N.C. App. 83, 89 (2012).

47.     Here, Plaintiff points to email traffic between the parties' representatives to establish the existence and terms of the alleged Contract to Reinstate.   It is apparent from the content of the emails that Defendant's representative, Chommie, was relaying information to, and taking instruction from, her superiors.  She did not purport to be Defendant's decision-maker with respect to the negotiations.  (*See* Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Exs. 5–6 (referencing conversations with her "boss" and "senior management").)

48.     On July 29, on behalf of her superiors, Chommie communicated an offer to Plaintiff for a new arrangement involving a significant increase in the deposit and an extension fee, and Shapiro testified that he contacted Chommie on July 31 to "resurrect the deal."  (Shapiro Aff. ¶ 14.)[6]

---

[6] There is nothing in the record describing whether and how this contact was made or the content of any communications.   The record does reflect, however, that negotiations continued after July 31.

49.     Thereafter, in another email on August 12, Chommie promised to communicate Plaintiff's position to "her boss" and, in the meantime, requested that Plaintiff confirm Malka Rubin's authority to act on behalf of Plaintiff in the event a deal was reached. (Br. Supp. Mot. Summ. J. Ex. 11.) Chommie followed this email with another one on August 13, this time communicating Defendant's position that it would reinstate the deal for the original purchase price if the deposit was increased from $1.0 to $1.2 million and the Plaintiff paid an additional $300,000 fee at closing. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 6.) Plaintiff responded the same day, rejecting the offer with an emailed counteroffer: "[l]et's split the baby in half[.]" (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 6.)

50.     Chommie did not immediately respond to the counteroffer but instead sent Shapiro an email restating her question regarding the authority of Plaintiff's representative, Malka Rubin, to sign any deal on behalf of Plaintiff. (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. Ex. 6.) Rather than confirming this point expressly, Shapiro responded with a copy of Plaintiff's operating agreement showing Malka Rubin as a signatory. (Br. Supp. Mot. Summ. J. Ex. 12.)

51.     Finally, on August 15, Chommie emailed Shapiro to inform him that her "bosses" had decided "not to move forward with the deal" and were "going in another direction with the asset." (Br. Supp. Mot. Summ. J. Ex. 13.)

52.     Based on the record before it, the Court does not find a meeting of the minds with respect to resurrecting the sale and, even if minds did meet, there is no signed writing evidencing the material terms of an agreement. Because the

undisputed facts support Defendant's position, the Court determines that no Contract to Reinstate was ever formed and, therefore, no Contract to Reinstate was breached.

53.     Accordingly, the Court GRANTS Defendant's Motion with respect to Plaintiff's Second and Fourth Causes of Action.

## B. Defendant's Counterclaim for Declaratory Judgment

54.     Defendant's Motion also seeks affirmative summary judgment with respect to its counterclaim for declaratory judgment.  Specifically, Defendant seeks declarations from the Court that: (a) Plaintiff defaulted under the Agreement; (b) Defendant has no further obligation to Plaintiff under the Agreement; and (c) Defendant may retain Plaintiff's $1 million deposit as liquidated damages. Defendant also seeks an award of its attorneys' fees and costs.  (Mot. Dismiss, Answer, & Countercl. ¶¶ 13–22.)   As explained below, the Court **GRANTS** Defendant's Motion and **ENTERS JUDGMENT** for the requested declaratory relief. *See Brooks,* 48 N.C. App. at 728; *see also* N.C. R. Civ. P. 57; N.C.G.S. § 1-254 (authorizing the Court "to declare rights, status, and other legal relations" under a written contract).

### a.  Plaintiff defaulted under the Agreement.

55.     Plaintiff contends that its failure to close on July 3 was not a breach of the Agreement because Defendant breached first by denying it access to the Property, and Defendant's breach relieved Plaintiff of its contractual obligations.  (Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 6–7.)   The Court has determined that Defendant's decision not to permit access based on Plaintiff's last-minute oral request was not a

breach of the Agreement. But even if it were, "a breach discharges further performance only if the breach was material." *Chesson v. Rives*, 2016 NCBC LEXIS 92, at \*34 (N.C. Super. Ct. Nov. 30, 2016) (citing *Crosby v. Bowers*, 87 N.C. App. 338, 345 (1987)). "A material breach is 'one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform.'" *Id.* (quoting *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 220 (2015)).

56. Defendant argues that its decision to deny access was not material because: (a) the Agreement provided that closing was not conditioned on an inspection but rather the property was sold "as is," and (b) Plaintiff's required performance was not contingent on Plaintiff obtaining financing. (*See* Br. Supp. Mot. Summ. J. 9–10; Reply Supp. Mot. Summ. J. 8.)

57. The Court agrees with Defendant. Under the terms of the Agreement, denying Plaintiff's request for a last-minute inspection of the property by its potential lender did not substantially defeat the purpose of the parties' arrangement. Plaintiff bid knowing it was buying the property "as is," and the language of the Agreement makes plain that its obligation to close on the Property was not dependent on its ability to obtain financing.

58. Accordingly, the Court finds that Defendant's decision not to afford Plaintiff access to the property shortly before the scheduled July 3 closing, even if it were determined to be wrongful, was immaterial and did not excuse Plaintiff's failure to close on July 3. *See Chesson*, 2016 NCBC LEXIS 92, at \*34 ("The Court can

determine materiality, as a matter of law, where it is clear based on the circumstances that the breach does not constitute 'a substantial failure to perform.'" (quoting *Supplee*, 239 N.C. App. at 220)); *see also Combined Ins. Co. v. McDonald*, 36 N.C. App. 179, 184 (1978) (holding that an employer's failure to provide notice of termination of employment was not a material breach that discharged the other party to the contract from performance).[7]

59.     Arguing in the same vein, Plaintiff next contends that it cannot be found to have breached the Agreement because it was prevented from meeting its contractual obligations by Defendant's wrongful conduct.  It argues that its funding source—Ameris Bank—needed to inspect the property before it would agree to finance the deal, and Defendant's decision to deny it access meant it was unable to obtain the loan.  (*See* Shapiro Aff. ¶ 8–9; Rubin Aff. ¶ 8–9; Pl.'s Br. Opp'n Def.'s Mot. Summ. J. 7–8.)[8]

60.     Indeed, "one who prevents the performance of a condition, or makes it impossible by his own act, will not be permitted to take advantage of the nonperformance." *Cater v. Barker*, 172 N.C. App. 441, 446 (2005) (quoting *Propst*

---

[7] Defendant presents evidence that it would have been impossible for Plaintiff to close on July 3 with Ameris Bank funding regardless of whether it had been afforded access in the days leading up to the closing because there was not sufficient time for the bank to process the loan.  (*See* Def.'s Suppl. Br. Supp. Mot. Summ. J. 15–18.)  Given its determinations above, the Court need not address this argument.

[8] The Court has previously determined that Plaintiff is estopped from benefitting from its late attempt to change its position regarding its funding source from Ameris Bank to Bernard Rubin and his partner.  (*See* Ord. & Op. Def.'s Mot. Sanctions, ECF No. 83).

*Constr. Co. v. N.C. Dep't of Transp.*, 56 N.C. App. 759, 761 (1982), *modified and aff'd per curiam*, 307 N.C. 124).

61.     In order to excuse nonperformance, however, the party who allegedly prevented performance must have acted wrongfully and "in excess of his legal rights." *Propst Constr. Co.*, 56 N.C. App. at 762 (quoting *Goldston Bros. v. Newkirk*, 233 N.C. 428, 432 (1951)).  As stated above, Defendant's decision to deny an oral request for access was not in excess of its rights under the Agreement.  Consequently, Plaintiff's reliance on the law regarding prevention does not change the result.  Moreover, this argument again ignores the express language of the Agreement, which eliminates the inability to obtain financing as a contingency for closing.  (Verified Compl. Ex. A § 4.1(b).)

62.     Therefore, the Court determines as a matter of law that Plaintiff breached the Agreement by failing to timely close on the Property.  (Verified Compl. Ex. A §§ 6.4 (Buyer's Deposit of Documents), 13.12 (Time of the Essence)); s*ee S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 620 (2008) (holding that the breach of contract claim must fail because the plaintiff failed to close within the required time frame and the contract included a "time is of the essence" provision).  Accordingly, the Court also determines that Defendant has no remaining obligations to Plaintiff under the Agreement.

### b. **Defendant is entitled to retain Plaintiff's deposit as liquidated damages.**

63.     As Plaintiff's counsel conceded during oral argument, if Plaintiff breached the Agreement, then Section 11.1 controls and Defendant properly retained

Plaintiff's deposit as liquidated damages. Furthermore, Plaintiff, which bears the burden of proof on this issue, presented no evidence to suggest that the $1 million liquidated damages provision was an unreasonable penalty. Given Plaintiff's failure to meet its burden, and because the purchase price of the Property was more than twenty-three (23) times the amount of the deposit, the Court determines that, under the circumstances here, $1 million is a reasonable liquidated damages provision and not a penalty. *See Seven Seventeen HB Charlotte Corp. v. Shrine Bowl of the Carolinas, Inc.*, 182 N.C. App. 128, 131 (2007) (concluding that the party seeking to invalidate a liquidated damages provision carries the burden of proof). In addition, the Court concludes that, pursuant to Section 11.1 of the Agreement, Defendant is entitled to retain Plaintiff's $1 million deposit as liquidated damages.

C. **Attorneys' Fees and Costs**

64. Finally, Defendant contends that the reciprocal attorneys' fee provision in the Agreement is valid and enforceable, and that as the prevailing party, it is entitled to recover its fees and costs in this matter. (Br. Supp. Mot. Summ. J. 15–17.)

65. By statute, "[i]f a business contract governed by the laws of this State contains a reciprocal attorneys' fees provision, the court or arbitrator in any suit, action, proceeding, or arbitration involving the business contract may award reasonable attorneys' fees in accordance with the terms of the business contract." N.C.G.S. § 6-21.6(c).

66. Reciprocal attorneys' fees provisions are defined as:

[p]rovisions in any written business contract by which each party to the contract agrees . . . upon the terms and subject to the conditions set forth

in the contract that are made applicable to all parties, to pay or reimburse the other parties for attorneys' fees and expenses incurred by reason of any suit, action, proceeding, or arbitration involving the business contract.

N.C.G.S. § 6-21.6(a)(4); *Insight Health Corp. v. Marquis Diagnostic Imaging of N.C., LLC*, 2018 NCBC LEXIS 69, at *5–6 (N.C. Super. Ct. July 6, 2018) (holding that a contract allowing the prevailing party to receive its attorneys' fees and costs if the party "engages an attorney for the purpose of enforcing this Agreement" contained a reciprocal fee provision).

67.     The definition of "business contract" in the statute is a tautology.  A business contract is a contract "entered into primarily for business or commercial purposes."  N.C.G.S. § 6-21.6(a)(1); *WFC Lynnwood I LLC v. Lee of Raleigh, Inc.*, 259 N.C. App. 925, 932 (2018) (concluding that a commercial lease was a business contract subject to N.C.G.S. § 6-21.6).  Thus, the Court determines that Section 16.1 is, indeed, a reciprocal attorneys' fees provision in a business contract.[9]

68.     Section 16.1 of the Agreement provides: "In the event of any litigation arising out of or under this Agreement and/or out of Buyer's ownership, development or construction upon the Property, the prevailing party shall be entitled to collect from the non-prevailing party reasonable attorneys' fees and costs."  (Verified Compl. Ex. A § 16.1.)

---

[9] Further, pursuant to N.C.G.S. § 6-21.6(b), "[r]eciprocal attorneys' fees provisions in business contracts are valid and enforceable for the recovery of reasonable attorneys' fees and expenses only if all of the parties to the business contract sign by hand the business contract." However, "[s]ignature 'by hand' is not intended to prevent" electronic signatures or images of manual signatures. *Id.* Thus, the fact that Plaintiff signed the agreement electronically does not impact the analysis.

69.     Thus, to recover attorneys' fees and costs, Section 16.1 requires that Defendant be the "prevailing party" in this litigation.  The prevailing party is "a party who prevails on a claim or issue in an action, not a party who prevails *in the action*." *Persis Nova Constr. v. Edwards*, 195 N.C. App. 55, 66 (2009).  Defendant here did both.

70.     Accordingly, the Court determines that Defendant is entitled to recover its reasonable attorneys' fees and costs incurred in this action.  To determine the amount of this award, the Court will consider evidence regarding the relevant facts and circumstances provided in N.C.G.S. § 6-21.6(c) as addressed by Defendant in a petition with supporting affidavits and other materials, as well as by Plaintiff in any response.

## VI.    CONCLUSION

71.     For these reasons, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment and **ORDERS** as follows:

a.  Summary Judgment is granted in Defendant's favor on Plaintiff's Second and Fourth Causes of Action, and Plaintiff's action against Defendant is **DISMISSED WITH PREJUDICE**;

b.  Summary Judgment is granted in Defendant's favor on Defendant's Counterclaim for Declaratory Judgment, and the Court **ENTERS JUDGMENT** declaring that:

(1) Plaintiff breached the Agreement;

(2) Defendant owes Plaintiff no further obligations under the Agreement;

(3) Defendant is entitled to retain Plaintiff's $1 million deposit as liquidated damages resulting from Plaintiff's breach of the Agreement; and

c.   Defendant shall file a petition in support of its request for attorneys' fees and costs within thirty (30) days from entry of this Order.  Plaintiff shall have twenty (20) days from Defendant's filing to respond to the petition.  Defendant may reply, if desired, within ten (10) days of Plaintiff's response.  The word limitations specified in Business Court Rule 7 shall apply.

**IT IS SO ORDERED**, this the 25th day of January, 2022.


/s/ Julianna Theall Earp
_____
Julianna Theall Earp
Special Superior Court Judge
 for Complex Business Cases